UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>FACEBOOK USER ID:<br><br>**100001131942125; also known as** www.facebook.com/jessica.collins.5 | Case No. ___6:22mj31___<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Daniel Bailey, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the user ID, including the content of the subscriber's or customer's account.

2. I am a Task Force Officer with the Drug Enforcement Administration (DEA) and have been since 2017. I am also a Detective with the Lynchburg Police Department (Virginia) and have been so employed since 2002. I am currently assigned to investigate drug trafficking organizations as a member of the DEA, Washington Field Division/Roanoke Resident Office.

1

My duties as a Task Force Officer involve the investigation of various criminal activities of narcotics traffickers and their associates. In investigating these matters, I have acted as a case agent, an undercover agent, and a contact agent for confidential sources. These investigations have resulted in the issuance of federal search warrants, seizure warrants, indictments, and convictions of persons for federal narcotics violations. During my employment as a law enforcement officer, I have received multiple hours of training in narcotics enforcement and investigative techniques, and I have personally participated in numerous investigations. I have also spoken on numerous occasions with informants, suspects, and other experienced narcotics traffickers concerning the methods and practices of drug traffickers, including the methods and practices used by traffickers of methamphetamine, heroin, and cocaine. I have been involved in the execution of numerous search warrants on electronic devices, including cellphones, and in obtaining location information for those devices.

3. The facts in this affidavit come from my own investigation, observations, training and experience, and information obtained from other law enforcement officers and witnesses, including members of the gang under investigation and their associates. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations that relate to violations of 21 U.S.C. §§ 846 and 841(a)(1) were committed. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband, or fruits of these crimes, as described in Attachment B.

**PROBABLE CAUSE**

5. The United States, including the Drug Enforcement Administration ("DEA"), is conducting a criminal investigation of Jessica COLLINS ("COLLINS"), Billie Jean MITCHELL ("MITCHELL"), Cameron FLESHMAN ("FLESMAN") and others regarding the violations of violations of 21 U.S.C. §§ 846 and 841(a)(1) in the Western District of Virginia and elsewhere. The government's investigation concerns COLLINS's, FLESHMAN's, and MITCHELL's involvement in the distribution of methamphetamine.

6. There is probable cause to believe that the Facebook Account, 100001131942125, further described in Attachment A ("SUBJECT ACCOUNT"), contains evidence of this activity. As further described in this affidavit, law enforcement identified the SUBJECT ACCOUNT as being managed and used by COLLINS to further facilitate narcotic transactions. This information was provided by Cameron FLESHMAN, a cooperating co-defendant in this investigation. An open source search of the SUBJECT ACCOUNT resulted in the discovery of multiple "selfie" images of COLLINS. The SUBJECT ACCOUNT further described COLLINS as being a manager of the Super 8 hotel. Law enforcement confirmed that information during the course of this investigation.

7. Beginning in/about February 2022, law enforcement began receiving information from sources of information regarding COLLINS, FLESHMAN, and MITCHELL's involvement in the distribution of methamphetamine. The sources of information advised that the illicit activity was occurring in the Western District of Virginia, specifically Appomattox and Lynchburg, Virginia.

8.  Beginning in August of 2022, MITCHELL was identified by law enforcement as source of supply for methamphetamine in the Western District of Virginia. In August of 2022, law enforcement utilized a confidential source of information to conduct two controlled purchases of methamphetamine from MITCHELL. Those controlled purchases took placed in the Western District of Virginia.

9.  In September of 2022, law enforcement conducted an interview of MITCHELL. During the interview MITCHELL directed law enforcement to approximately ten grams of methamphetamine. MITCHELL identified her source of supply of the methamphetamine as Cameron FLESHMAN.

10. In September of 2022, law enforcement utilized MITCHELL to make a controlled purchase of methamphetamine from FLESHMAN. That controlled purchase took place in the Western District of Virginia.

11. On October 21, 2022, law enforcement conducted a non-custodial interview of MITCHELL. MITCHELL advised law enforcement that MITCHELL had been purchasing methamphetamine from FLESHMAN on a weekly basis for approximately the past eight months. MITCHELL advised she would purchase the methamphetamine for personal use and re-distribution.

12. MITCHELL identified FLESHMAN's source of supply of methamphetamine as COLLINS. MITCHELL advised that MITCHELL was present when COLLINS supplied FLESHMAN with methamphetamine.

13. On October 21, 2022, law enforcement conducted a non-custodial interview of Cameron FLESHMAN. FLESHMAN advised law enforcement that FLESHMAN had been selling methamphetamine, in the Western District of Virginia, since 2014. FLESHMAN

advised that FLESHMAN was incarcerated for approximately two years during that timeframe.

14.     FLESHMAN identified a source of supply of methamphetamine as Jessica COLLINS ("COLLINS"). FLESHMAN advised COLLINS was selling methamphetamine in the Western District of Virginia. FLESHMAN advised that for, approximately, the previous four months, COLLINS would supply FLESHMAN with methamphetamine on, approximately, a weekly basis.

15.     FLESHMAN advised that he would use his Facebook Messenger account, "Cameron Fleshman," to contact COLLINS on COLLINS's Facebook Messenger account to facilitate the methamphetamine purchases.

16.     In October of 2022, FLESHMAN, acting as a Confidential Source for law enforcement, conducted a controlled purchase of methamphetamine from COLLINS. That controlled purchase took place in the Western District of Virginia. FLESHMAN contacted COLLINS via Facebook Messenger to facilitate that controlled purchase.

17.     In October of 2022, law enforcement obtained and executed a federal search warrant (6:22mj17) on the Facebook account of FLESHMAN. Law enforcement later analyzed the data obtained from Facebook associated with that account. Based on that data, it was determined that beginning in January of 2022 through October 2022, FLESHMAN exchanged messages with the SUBJECT ACCOUNT. Those messages consist of language indicative of narcotic sales. That language included, but was not limited to, FLESHMAN advising that "it's 5 short" and sending a picture of a digital scale registering "24.46 COLLINS later replied "he was putting them at least a g over everything now." Through the

exchange of messages, COLLINS and FLESHMAN discuss multiple transactions of hundreds of dollars.

18. In November of 2022, COLLINS and FLESHMAN were served with notices from the United States Attorney's Office of their intent to prosecute COLLINS and FLESHMAN for violation of federal drug trafficking offenses.

19. On November 9, 2022, COLLINS was indicted by a federal Grand Jury for Conspiring to Distribute Methamphetamine and Distribution of Methamphetamine.

20. On November 16, 2022, COLLINS was arrested at her residence, 535 Rough Creek Road, Pamplin, Virginia. During the course of her arrest, a cellular phone was observed in plain view on a table inside of the residence. COLLINS claimed ownership of that device. That device was transported to the Lynchburg Police Department, labelled as Item 1 of Case No. 2022-014797, and placed in a secure location.

21. Subsequent to COLLINS' arrest, COLLINS was read her Miranda Warnings. COLLINS advised she understood her rights. COLLINS advised law enforcement that she did not want law enforcement to search her cellular device without her lawyer present.

22. Later that same day, while COLLINS was waiting to be processed, this affiant conducted a separate interview of COLLINS. COLLINS advised she had made statements to the other law enforcement officer about having a lawyer present while a search of her cellular device was conducted. COLLINS did not specifically request to have a lawyer present during the interview. This affiant advised COLLINS that he wished to speak with COLLINS about her role in the investigation in which COLLINS was charged. COLLINS agreed to speak

with law enforcement. This affiant re-read COLLINS her Miranda Warning. COLLINS advised she understood her rights.

23.  During the interview, COLLINS advised that she supplied FLESHMAN with methamphetamine on multiple occasions. COLLINS advised that during several of those occasions, COLLINS would deliver methamphetamine to FLESHMAN in Appomattox County, Virginia. COLLINS advised that FLESHMAN would pay for the methamphetamine via the use of an electronic money transfer application.

24.  On November 17, 2022, law enforcement submitted a preservation request to Facebook for all available data associated with the SUBJECT ACCOUNT.

25.  Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

26.  Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

27.  Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with

individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

28. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

29. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a

space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

30. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

31. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

32. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

33. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as

webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

34. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

35. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

36. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

37. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

38. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

39. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

40. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.

By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

41. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

42. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B,

government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

43. Based on the foregoing, I request that the Court issue the proposed search warrant.

44. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

45. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

46. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

        _s/Daniel Bailey_
        Daniel Bailey, Task Force Officer
        Drug Enforcement Administration

Received by reliable electronic means and sworn and attested to by telephone on this __5th__ day of December 2022.

*Robert S. Ballou*
_____
ROBERT S. BALLOU
UNITED STATES MAGISTRATE JUDGE